**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MILKBOY CENTER CITY LLC, | : | |
| individually and on behalf of all others | : | |
| similarly situated | : | CIVIL ACTION NO. 2:20-CV-02036-TJS |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE CINCINNATI | : | |
| CASUALTY COMPANY, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

AND NOW, on this _____ day of _____ , 2020, upon consideration

of the Motion by Defendant The Cincinnati Casualty Company to Dismiss Plaintiff's Complaint,

and any response to it, it is hereby ORDERED that the Motion is GRANTED.

BY THE COURT:

_____
J .

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILKBOY CENTER CITY LLC, individually and on behalf of all others similarly situated | : : : : | CIVIL ACTION NO. 2:20-CV-02036-TJS |
| Plaintiff, | : : | |
| v. | : : | |
| THE CINCINNATI CASUALTY COMPANY, | : : : | |
| Defendants. | : : | |

## MOTION BY THE CINCINNATI CASUALTY COMPANY TO
## DISMISS PLAINTIFF'S COMPLAINT

     Defendant The Cincinnati Casualty Company moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of Plaintiff Milkboy Center City LLC.  In support of this motion, The Cincinnati Casualty Company relies on and incorporates by reference the accompanying memorandum of law and exhibits.[1]

                                 **LITCHFIELD CAVO LLP**

                        BY:   /s/ Lawrence M. Silverman
                                 Lawrence M. Silverman
                                 (Bar ID No. 17854)
                                 1515 Market Street, Suite 1220
                                 Philadelphia, PA  19102
                                 Telephone:  215.557.0111
                                 Facsimile:  215.557.3771
                                 silverman@litchfieldcavo.com

---

[1] This case has been identified as a member case in the matter of *In re: COVID-19 Business Interruption Insurance Coverage Litigation*, MDL no. 2942, which is before the United States Judicial Panel on Multidistrict Litigation. The Panel has not entered a transfer order at this time. Therefore, jurisdiction remains with this Court with respect to disposition of this motion and otherwise. Glasstech, Inc. v. AB Kyro OY, 769 F.2d 1574 (Fed. Cir. 1985) (finding that jurisdiction remained with the U.S. District Court for the District of Michigan until the U.S. Judicial Panel on Multidistrict Litigation entered its order transferring the case to the U.S. District Court for the Northern District of Ohio.).

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MILKBOY CENTER CITY LLC, individually and on behalf of all others similarly situated | : : : : | CIVIL ACTION NO. 2:20-CV-02036-TJS |
| Plaintiff, | : : | |
| v. | : : | |
| THE CINCINNATI CASUALTY COMPANY, | : : : | |
| Defendants. | : : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CINCINNATI CASUALTY**
**COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Pursuant to Fed.R.Civ.P. 12(b)(6) and L.R. 7.1, The Cincinnati Casualty Company ("Cincinnati") moves to dismiss this case because the Plaintiff fails to state a claim on which relief may be granted. Based on the allegations of the Complaint ("the Complaint") and the plain language of Cincinnati's insurance policy ("the Policy"), Plaintiff cannot prove its claims.

**OVERVIEW AND SUMMARY OF ARGUMENT**

The Policy at issue supplies property insurance coverage. It operates to indemnify loss or damage to property, such as in the case of a fire or storm. Coronavirus (or "COVID-19") does not damage property; it hurts people. Plaintiff demands the Policy's Business Income, Extended Business Income, Extra Expense, and Civil Authority coverages. But, because they are part of a property insurance policy, these coverages protect Plaintiff only for income losses tied to physical damage to property, not for economic loss caused by governmental or other efforts to protect the public from disease. Plaintiff's allegations establish that Plaintiff has not sustained any losses attributable to direct physical loss to property. Rather, Plaintiff alleges that the Coronavirus

pandemic spreads COVID-19 among humans. Moreover, the same direct physical loss requirement applies to all of the coverages for which Plaintiff sues—including the Extended Business Income coverage, the Extra Expense coverage, and the Civil Authority coverage.

At bottom, Plaintiff bears the initial burden of showing actual direct physical loss to property. This is always necessary to make a *prima facia* case for property insurance coverage. Yet, Plaintiff's allegations establish that it has not sustained any direct physical loss. Rather, Plaintiff asks this Court to find the Policy applies to cover purely financial losses sustained as a result of COVID-19-related orders requiring non-essential businesses to cease in-person operations. But, because direct physical loss is a fundamental prerequisite to coverage under the Policy, they ask for a vast extension of Pennsylvania law that would create coverage from whole cloth. This should not be permitted.

For all of the reasons, and for the other reasons established below, Plaintiff's Complaint should be dismissed.

## STATEMENT OF FACTS

### I.  Allegations of the Complaint

The Complaint includes the following allegations:

- Plaintiff owns and operates MilkBoy Philadelphia, a music venue, bar, and restaurant. Plaintiff's future is now threatened by the government-ordered shutdowns prohibiting performances and on-site dining, which prevents patrons' and employees' access to the property and prohibits use of the property for its intended purpose. (Compl. at ¶ 1).

- Plaintiff was forced to suspend business at MilkBoy Philadelphia due to orders issued by civil authorities in Pennsylvania mandating the suspension of business for on-site services to prevent potential exposure to COVID-19. Plaintiff was also required to take necessary steps to prevent further damage and minimize the suspension of business and continue operations. (Compl. at ¶ 3)

- In return for the payment of a premium, Cincinnati issued Policy No. ENP 053 39 92 to MilkBoy Center City LLC, for a policy period of April 29, 2019 to April 29, 2022. Policy No. ENP 053 39 92. [Attached to Plaintiff's Complaint as Exhibit "A"] MilkBoy Center City LLC has performed all of its obligations under Policy No. ENP 053 39 92, including the payment of the premium. The policy's Schedule of Locations includes MilkBoy Philadelphia, 1100 Chestnut Street, Philadelphia, PA. (Compl. at ¶ 13).

- Pursuant to the policy's "Building and Personal Property Coverage Form," Form FM 101 05 16, the policy covers "direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." The policy defines "loss" as "accidental physical loss or accidental physical damage." (Compl. at ¶ 15).

- The policy provides business income coverage in two separate provisions: within the "Building and Personal Property Coverage Form," Form FM 101 05 16, and pursuant to the "Business Income (and Extra Expense) Coverage Form," Form FA 213 05 16. Both forms contain substantially identical provisions triggering Business Income and Extra Expense coverage: that "[w]e will pay for the actual loss of 'Business Income'. . . you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'", and that the "loss" must be "caused by or result[ing] from" a Covered Cause of Loss. (Compl. at ¶ 16)

- The policy also provides coverage for business income coverage caused by an act of civil authority. Pursuant to the policy's Form FM 101 05 16, "[w]hen a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises', we will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises'. . ." (Compl. at ¶ 17).

- None of the policy's provisions contain any exclusion for losses caused by a virus or by governmental orders issued in order to prevent exposure to a virus. No other exclusions in the policies apply to this coverage. (Compl. at ¶ 18).

- Efforts to prevent exposure to COVID-19 have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes (the "Closure Orders"). (Compl. at ¶ 19).

3

- Plaintiff's business is not considered "essential," and has therefore been subject to a variety of Closure Orders by state and local authorities, preventing Plaintiff from operating its businesses, limiting its operations, and/or from use of the premises for its intended purpose. (Compl. at ¶ 20).

- These Closure Orders include, but are not limited to, Pennsylvania Governor Wolf's order dated March 19, 2020 requiring all non-life-sustaining businesses in the Commonwealth to cease operations and close all physical locations. The Pennsylvania Supreme Court recently clarified that the Governor's order has resulted in the temporary loss of use of non-essential business premises effected by the order, and that the order was issued to protect the lives and health of millions of Pennsylvania citizens. See Friends of DeVito v. Wolf, No. 68 MM 2020, 2020 WL 1847100 at *17 (Pa. Apr. 13, 2020). [footnote omitted](Compl. at ¶ 21).

- Plaintiff experienced a "Covered Cause of Loss" by virtue of the Closure Orders, which denied use of the premises by causing a necessary suspension of operations during a period of restoration. The Closure Orders operate as a blockade that prevents employees and patrons from entering and operating the business for its intended purpose. (Compl. at ¶ 22).

- This Covered Cause of Loss triggered coverage pursuant to the Business Income, Extended Business Income, Extra Expense, and Civil Authority provisions of the policy. [subparagraphs omitted]. (Compl. at ¶ 23).

- None of Cincinnati's policy exclusions apply to Plaintiff's claims. (Compl. at ¶ 24)

- On or about April 15, 2020, Cincinnati denied Plaintiff's claim. (Compl. at ¶ 25)

- Cincinnati agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration." (Compl. at ¶ 41)

- Under the Cincinnati policy, a "suspension" means "the slowdown or cessation of your business activities" and "a part or all of the 'premises' is rendered untentantable." (Compl. at ¶ 42)[1]

---

[1] In fact, the Policy defines "suspension" to mean "slowdown or cessation of your business activities; ***and [t]hat a part or all of the 'premises' is rendered untentantable.***" (Ex. A, Policy, p. 74) (emphasis added; internal sub-numbering omitted). No facts alleged in the Complaint show the Plaintiff's premises were untenantable. But, even if they were, the Complaint fails as a matter of law because it does not allege physical loss to property caused by the Coronavirus, the Closure Orders, or otherwise.

4

- Pursuant to the business income coverage provisions within the "Building and Personal Property Coverage Form," Form FM 101 05 16, and "Business Income (and Extra Expense) Coverage Form," Form FA 213 05 16, Cincinnati promised that it that would "pay for the actual loss of 'Business Income'. . . you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" (Compl. at ¶ 43)

- Pursuant to the form's extended business income provision, Cincinnati promised that "[f]or 'Business Income' Other Than 'Rental Value'", if the necessary 'suspension' of your 'operations' produces a 'Business Income' or Extra Expense 'loss' payable under this Coverage Part, we will pay for the actual loss of 'Business Income' you sustain and Extra Expense you incur. . ." (Compl. at ¶ 44)

- Pursuant to the form's Extra Expense provision, Cincinnati promised that "[w]e will pay Extra Expense you sustain during the 'period of restoration.'" (Compl. at ¶ 45)

- The Closure Orders caused direct physical loss and damage to Plaintiff and the other Business Income Breach Class members' Scheduled Premises, requiring suspension of operations at the Scheduled Premises. Losses caused by the Closure Orders thus triggered the business income, extended business income, and extra expense provisions of Plaintiff's and the other Breach Class members' policies. (Compl. at ¶ 46)

- The Closure Orders also caused direct physical loss and damage to property *other* than Plaintiff and the other Breach Class members' premises, resulting in a prohibition of access to the premises. Losses caused by the Closure Orders thus triggered the civil authority provision of Plaintiff's and the other Breach Class members' policies. (Compl. at ¶ 47)(Italics in original)

- Plaintiff and the other Breach Class members have complied with all applicable provisions of their policies and/or those provisions have been waived by Cincinnati, or Cincinnati is estopped from asserting them, and yet Cincinnati has abrogated its insurance coverage obligations. (Compl. at ¶ 48)

- By denying coverage for any Business Income losses incurred by Plaintiff and the other Breach Class members, Cincinnati has breached its coverage obligations under the policies. (Compl. at ¶ 49)

The Complaint contains two counts: 1) Breach of Contract and 2) Declaratory Judgment.

The breach of contract claim presents questions of contract interpretation for the Court. The claim

5

for declaratory judgment repeats and is subsumed within the breach of contract claim. The Complaint also seeks certification of two nationwide classes, referred to in the Complaint as the "Breach Class" and the "Declaratory Judgment Class." (Compl. at ¶ 27).[2]

## II.     The Plaintiff's Policy

### A.      The Insurance Policy at Issue

Cincinnati issued Policy No. ENP 053 39 92 to Plaintiff MilkBoy Center City LLC, for a policy period of April 29, 2019 to April 29, 2022. (Ex. A, Policy, p. 9).[3] Cincinnati issued the Policy in Pennsylvania through a Pennsylvania insurance agency. The Policy insures Plaintiff's premises in Philadelphia, Pennsylvania. (Policy, p. 13; *and see* Compl. at ¶ 13).

The pertinent forms are the Building and Personal Property Coverage Form, Form FM 101 05 16 and the Business Income (and Extra Expense) Coverage Form, Form FA 213 05 16 (Policy, pp. 35-74 & 105-113). The Building and Personal Property Coverage form, FM 101 05 16 is the main property coverage form. The Business Income (and Extra Expense) Coverage form, FA 213 05 16 addresses business income and extra expense. Forms FM 101 and FA 213 supply Business Income and Extra Expense Coverage, but only if the necessary elements for coverage are satisfied. Form FA 213 also contains the Extended Business Income and Civil Authority coverages at issue in the Complaint.

---

[2] Cincinnati does not address Plaintiff's "Class Action Allegations" because the Complaint does not state a claim on which relief may be granted in the first instance. Cincinnati reserves the right to dispute the class allegations and to dispute class certification in the event this Court denies Cincinnati's Motion to Dismiss.

[3] The Policy is attached as Exhibit A to Plaintiff's Complaint. For the convenience of the Court, that Policy is also attached hereto as Exhibit A and referred to herein as "Policy." Page references are to the Bates stamped page numbers in the footer of Exhibit A, and also coincide with the ECF stamped page numbers on original and appended Exhibit. The Court may take judicial notice of the Policy. *See, e.g., Hynoski v. Columbia Cty. Redevelopment Auth.*, 941 F. Supp. 2d 547, 555 (M.D. Pa. 2013) ("The court may . . . take judicial notice of certain facts, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.")

### B.  The Policy's Direct Physical Loss Requirement

The requirement of "direct physical loss" is a core element in property insurance policies like Plaintiff's, and appears in multiple places in the policy. For example, direct physical loss to the Plaintiff's property is required for Business Income coverage:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by **direct** "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown on the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(Policy, pp. 52 & 105) (emphasis added). Covered Cause of Loss is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Policy, pp. 39 & 106); "Loss" is defined as "accidental **physical** loss or accidental physical damage." (Policy, pp. 72 & 113). (emphasis added).

Accordingly, there is no Covered Cause of Loss, and therefore no Business Income coverage, under Plaintiff's Policy, unless the insured first establishes, among other things, that there is direct physical loss to covered property.

A Covered Cause of Loss, and thus direct physical loss, is an express requirement for coverage under each of the particular coverages involved: Extended Business Income, Extra Expense, and Civil Authority. (Policy, pp. 54 & 107 (Extended Business Income); pp. 53 & 105 (Extra Expense); pp. 53 & 106 (Civil Authority)).

Additionally, the Extended Business Income coverage does not apply unless the insured first sustains a "'Business Income' or 'Extra Expense' 'loss' payable under [the Policy]." (Policy, pp. 54 & 107). Thus, direct physical loss is required for Extended Business Income coverage.

Furthermore, while the definition of Covered Cause of Loss refers to exclusions, exclusions do not come into play unless there is first direct physical loss. See, e.g., *Erie Ins. Grp. v. Catania*,

7

95 A.3d 320, 322 (2014) ("In actions arising under an insurance policy [Pennsylvania] courts have established a general rule that it is a necessary prerequisite for the insured to establish that his claim falls within the coverage provided by the insurance policy."); *Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013)

### C.   Additional Requirements for Coverage Under the Policy

In addition to the direct physical loss requirement, Civil Authority coverage requires an actual loss of Business Income that an insured sustains if the loss is caused by an action of a civil authority. Under the Policy, Civil Authority coverage is only provided if all of the following apply:

**(a)**   A ***Covered Cause of Loss*** caused damage to property other than Covered Property at the insured premises;

**(b)**   ***Access*** to the insured premises ***is prohibited*** by civil authority;

**(c)**   ***Access*** to the area immediately surrounding the damaged property ***is prohibited*** by civil authority as a result of the damage to other property; and

**(d)**   The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the ***Covered Cause of Loss*** that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Policy, pp. pp. 53 & 106) (emphasis added).

Accordingly, Civil Authority coverage in the Plaintiff's Policy requires, among other things, direct physical loss to property other than the insured's property and prohibition of access to the insured's property as a result of that direct physical loss.

## ARGUMENT

### I.   Motion to Dismiss Standard

Dismissal is an appropriate mechanism here because this motion presents a pure question of law. A motion to dismiss for failure to state a claim should prevail if, after the complaint's allegations are taken as true and all reasonable inferences are made in favor of the nonmoving

party, the nonmoving party cannot prove facts supporting its claim. *See, e.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Stated another way, to survive a motion to dismiss, a complaint must contain sufficient factual matter to show the claim for relief is "plausible on its face." *Warren Gen. Hosp.*, 643 F.3d at 84; *and see Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), *citing Twombly,* 550 U.S. at 570. A claim does not meet the plausibility standard unless it includes enough factual content to "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Importantly, legal conclusions and other unsupported conclusions stated in the Complaint may not be considered in determining a motion to dismiss. *See, e.g., Fischbein v. Olson Research Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020) (In determining whether plaintiff has stated a claim sufficient to survive a motion to dismiss, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements."); *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007), *cert. denied*, 552 U.S. 1021 (2007) (On a motion to dismiss, the Court does not accept as true "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.") (internal citations and quotations omitted); *Iqbal,* 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Additionally, the Court should consider the insurance Policy and the Closure Orders in ruling on this motion. *See, e.g., Doe v. Univ. of Sciences*, 961 F.3d 203 (3d Cir. 2020) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint[,] exhibits attached to the complaint, and matters of public record. In addition, 'a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to

dismiss into one for summary judgment.'") (alteration in original; internal citations omitted); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The Closure Orders are matters of public record.[4]

Here, the Complaint's allegations are in conflict with the terms of the Policy and the Closure Orders. This means that the Policy and the Closure Orders control. *See, e.g.*, *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859, n. 8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327 & n. 22 (4th ed.) (Wright & Miller) ("It appears to be well settled that when a disparity exists between the written instrument annexed to the pleadings and the allegations in the pleadings, the terms of the written instrument will control, particularly when it is the instrument being relied upon by the party who made it an exhibit.") (collecting cases).

Indeed, dismissal for failure to state a claim is appropriate where, as here, the plain and unambiguous language of the parties' contract shows the plaintiff cannot "plausibly allege" its contradictory interpretation. *D & M Sales, Inc. v. Lorillard Tobacco Co.*, No. CIV.A.09-2644, 2010 WL 786550, at *4 (E.D. Pa. Mar. 8, 2010) (Padova, D.J.). In this context, any amendment of the complaint would be futile since "[p]laintiff cannot state a claim in light of the controlling contractual terms." *D & M Sales, Inc.*, No. CIV.A.09-2644, 2010 WL 786550, at *4.

---

[4] The Complaint alleges, "The[ ] Closure Orders include, but are not limited to, Pennsylvania Governor Wolf's order dated March 19, 2020." (Compl. at ¶ 21). Governor Wolf's Order, the only Order alleged in the Complaint is available for viewing at: https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf.

## II.     There is No Direct Physical Loss and Therefore No Coverage

As shown, the Policy only provides coverage where there is direct physical loss. But, the Complaint does not allege facts showing any direct physical loss to any property. Accordingly, Plaintiffs cannot possibly prove their claim.

### A.     There Are No Facts to Show Plaintiff's Property was Physically Altered, thus there is No Direct Physical Loss

Plaintiff asks the Court to create coverage where there is none. This is not allowed under Pennsylvania law. Under Pennsylvania law, "When the terms of an insurance policy are clear and unambiguous, the court is bound to give effect to the policy and cannot interpret the policy to mean anything other than what it says." *Reeves v. Travelers Companies*, 296 F. Supp. 3d 687, 691 (E.D. Pa. 2017) (Baylson, J.) (internal quotations omitted), *citing Clarke v. MMG Ins. Co.*, 100 A.3d 271, 275 (Pa. Super. Ct. 2014); *Byoung Suk An v. Victoria Fire & Cas. Co.*, 113 A.3d 1283, 1288 (2015) (It is "well settled" under Pennsylvania law that "courts should not 'under the guise of judicial interpretation,' expand coverage beyond that provided in the policy."), *citing Guardian Life Ins. Co. of America v. Zerance,* 505 Pa. 345, 479 A.2d 949, 953 (1984).

No case, in Pennsylvania or elsewhere, has held that the existence of a virus constitutes direct physical loss. Moreover, even if the Coronavirus could cause direct physical loss to property, which it cannot, the only loss alleged here is not physical loss to property, but a purely financial loss. (Compl. at ¶ 22). As such, Plaintiff cannot plausibly argue that the virus or the Closure Orders caused any physical alteration to its property that could trigger coverage.

### 1.     Pennsylvania Law Requires Physical Alteration to Property; There is None Here

Financial losses unrelated to physical loss or physical damage at the insured premises do not satisfy the Policy's direct physical loss requirement. *Philadelphia Parking Authority v. Fed.*

*Ins. Co.,* 385 F. Supp. 2d 280 (S.D.N.Y. 2005) (applying Pennsylvania law), is analogous to this case. There, the plaintiff operated a parking garage at the Philadelphia International Airport. *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 281. Since its garage depended on the airport to attract customers, it sustained a significant loss of business when the FAA grounded all flights in the United States following the 9/11 terrorist attacks. *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282-283. Plaintiff sought business income, extra expense, and civil authority coverage under its property insurance policy.

The business income, extra expense, and civil authority coverage provisions in *Philadelphia Parking Authority* were substantially similar to those in the Policy here. Philadelphia Parking Authority's business income coverage applied to the insured's loss of income during the "period of indemnity" in the event of an actual interruption of the insured's business, provided that the "actual interruption of [Philadelphia Parking Authority's] operations [was] caused by ***direct physical loss or damage*** caused by a covered cause of loss . . . ." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282 (emphasis added). Similarly, the civil authority coverage only applied in the event "a civil authority ***prohibits*** access to [Philadelphia Parking Authority's] covered property because of ***direct physical loss or damage*** caused by a covered cause of loss to property not otherwise excluded in the vicinity of [Philadelphia Parking Authority's] covered property." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 282 (emphasis added).

*Philadelphia Parking Authority* holds that such provisions unambiguously require that "a 'covered cause of loss' . . . result in some 'direct physical loss or damage,' which in turn must interrupt the insured's business operations." And, "***the claimed loss or damage must be physical in nature***." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 288 (emphasis added). *Philadelphia Parking Authority* dismisses the complaint because it did not allege any physical loss or damage

12

to the parking garage or other property in its vicinity. *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 287. As such, the claim "clearly [did] not fit the plain language of the Business Income Provision." *Philadelphia Parking Auth.*, 385 F. Supp. 2d at 287.

Here, Plaintiff's factual allegations show there was no direct physical loss. Nowhere in its Complaint does Plaintiff assert the Coronavirus was present at its premises. Instead, Plaintiff alleges that financial losses it sustained because of the Closure Orders constitute direct physical loss. (*See, e.g.,* Compl. at ¶¶ 20-22). But, like the virus, the Closure Orders did not physically alter any property. Rather, the Complaint alleges, the Closure Orders "prevent[ed] Plaintiff from operating its businesses, limiting its operations, and/or from use of the premises for its intended purpose" because they "prohibiting performances and on-site dining." (Compl. at ¶¶ 1 & 20). But, Plaintiff admits this was done to prevent exposure to a virus. (Compl. at ¶¶ 18-19 & 21). Humans infecting humans—through direct contact, or otherwise—is not direct physical loss to property.[5]

In essence, Plaintiff asserts that the Policy's direct physical loss requirement is met whenever a business suffers economic harm. This is contrary to *Philadelphia Parking Authority* and a host of other cases holding that direct physical loss requires actual, tangible, permanent, physical alteration of property, as discussed below.

### 2. *Philadelphia Parking Authority* is to the Same Effect as the Prevailing Law Nationally

*Philadelphia Parking Authority* is consistent with the prevailing law nationally. *See, e.g.*, 10A *Couch on Ins.* § 148:46 ("The requirement that the loss be 'physical,' given the ordinary definition of that term, ***is widely held*** to exclude alleged losses that are intangible or incorporeal

---

[5] The Court may take judicial notice of the fact that essential businesses were permitted to remain open, even where the presence of COVID-19 was confirmed. And, further, that the Closure Orders permitted Plaintiff's premises to remain open for food preparation, take-out and delivery services. Thus, the Closure Orders were not issued as a result of any direct physical loss to anybody's property.

and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (Emphasis added) (collecting cases); *see also Source Food Tech., Inc. v. U.S. Fid. & Guar. Co.,* 465 F.3d 834 (8th Cir. 2006) (applying Minnesota law); *Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 400 F.3d 613 (8th Cir. 2005) (applying Minnesota law); *Great Plains Ventures, Inc. v. Liberty Mut. Fire Ins. Co.*, 161 F. Supp. 3d 970, 978-979 & n. 4 (D. Kan. 2016) (applying Kansas law) (the phrase "physical loss or damage" "***unambiguously***" requires "***physical alteration***" of property) (emphasis added); *NE. Georgia Heart Ctr., P.C. v. Phoenix Ins. Co.*, No. 2:12-CV-00245-WCO, 2014 WL 12480022, at *6 (N.D. Ga. May 23, 2014) (applying Georgia law) ("The court will not expand 'direct physical loss' to include loss-of-use damages when the property has not been physically impacted in some way. To do so would be equivalent to erasing the words 'direct' and 'physical' from the policy."); *J. O. Emmerich & Assocs., Inc. v. State Auto Ins. Companies*, No. 3:06CV00722-DPJ-JCS, 2007 WL 9775576, at *3 (S.D. Miss. Nov. 19, 2007) ("Plaintiff's interpretation of the [insurance] contract would render the words 'direct' and 'physical' meaningless in the context of the policy.") (collecting cases).

Source *Food Tech., Inc.* is a seminal case concerning the direct loss requirement. There, an embargo on the importation of Canadian beef due to mad cow disease prevented a truck carrying the insured's beef product, which was not itself contaminated, from crossing the border. *Source Food Tech., Inc.,* 465 F.3d at 835. As a result, the insured sustained significant financial losses because it could not fill its customers' orders. *Source Food Tech., Inc.,* 465 F.3d at 835.

Source Food claimed lost business income under its insurance policy. That policy, like the Policy here, covered the suspension of business operations "caused by *direct physical loss to Property*". *Source Food Tech., Inc.,* 465 F.3d at 835. (Emphasis in original). Source Food argued

14

"that the closing of the border caused direct physical loss to its beef product because the beef product was treated as though it were physically contaminated by mad cow disease and lost its function." *Source Food Tech., Inc.,* 465 F.3d at 836. *Source Food* rejects this argument: "To characterize Source Food's inability to transport its truckload of beef product across the border and sell the beef product in the United States as direct physical loss to property would render the word 'physical' meaningless." *Id.* at 838.

*Pentair* is to the same effect. *Pentair* rejects the insured's contention that its Taiwanese suppliers' inability to function after a loss of power caused by an earthquake constituted direct physical loss or damage. *Pentair, Inc.*, 400 F.3d at 616. *Pentair* holds that loss of use or function can be relevant to determining the amount of loss, *but only once the insured first establishes physical loss or damage*. *Id*. ("Pentair's argument, if adopted, would mean that direct physical loss or damage is established *whenever* property cannot be used for its intended purpose.") (Emphasis in original).

*Source Food* and *Pentair* are well-reasoned cases and should be followed. Moreover, there are no material differences between Minnesota's and Pennsylvania's respective decisions on pertinent insurance law issues. Both states seek to apply the plain meaning of an insurance policy. *See, e.g., Reeves v. Travelers Companies*, 296 F. Supp. 3d at 691, *citing Clarke*, 100 A.3d at 275 (Pa. Super. Ct. 2014); *Guardian Life Ins. Co. of America v. Zerance,* 479 A.2d at 953; *accord, Depositors Ins. Co. v. Dollansky*, 905 N.W.2d 513, 515 (Minn. Ct. App. 2017), *aff'd*, 919 N.W.2d 684 (Minn. 2018). As such, it is appropriate for this Court to follow the sound construction and application of the "direct physical loss" requirement stated in so many cases, including *Philadelphia Parking Authority, Source Food*, and *Pentair*.

Further, emerging decisions concerning recent claims similar to Plaintiff's show that there is no physical loss or physical damage as required for coverage under similarly worded policies. They hold that the Coronavirus and related closure orders do ***not*** cause "physical," i.e., actual, tangible, structural, loss or damage to property. *See, e.g., Gavrilides Management Company et al. vs. Michigan Insurance Company*, Case No. 20-258-CB-C30 (July 2, 2020, Ingham County) ("Direct physical loss of or damage to the property "has to be something with material existence. Something that is tangible. Something . . . that alters the physical integrity of property."); *Social Life Magazine, Inc. v. Sentinel Ins. Co., Ltd.*, 1:20-cv-03311-VEC (S.D.N.Y.), ECF No. 24-1 at pp. 5 & 15 (the Coronavirus damages lungs; not printing presses).[6]

Here, as in the precedents Cincinnati relies on, there was no direct physical loss. Plaintiff does not allege anywhere in its Complaint that the Coronavirus physically altered its property. Indeed, even at premises where (unlike Plaintiff's) the virus has been confirmed to be present, such as hospitals and nursing homes, the buildings have remained open. This is because those buildings and properties are themselves undamaged.

The financial losses Plaintiff asserts do not constitute direct physical loss to property. Thus there can be no Business Income or Extra Expense coverage here.

**B.     Coronavirus Does Not Affect the Structural Integrity of Property Because it Can Be Removed by Cleaning**

There is no direct physical loss in situations where a contaminant or substance can be cleaned. *See*, *e.g.*, *Mastellone*, 2008-Ohio-311, ¶ 68 (no direct physical loss because mold could be removed via cleaning, and its presence did not alter or otherwise affect the structural integrity

---

[6] No written opinions have been issued in *Gavrilides Management Company* and *Social Life* at the time of filing this brief. The oral arguments and the Court's oral ruling in *Gavrilides* are available for viewing on YouTube: https://www.youtube.com/watch?v=Dsy4pA5NoPw&feature=youtu.be. A copy of the hearing transcript in *Social Life* is available through the Federal Court's filing system, PACER, and is attached for the Court's convenience as Exhibit B.

of the siding), *citing* 10A *Couch on Ins.* § 148:46 (3d Ed.1998); *Mama Jo's, Inc. v. Sparta Ins. Co.,* 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[W]ith regards to Plaintiff's initial claim for cleaning, cleaning is not considered direct physical loss."); *Universal Image Prods., Inc. v. Chubb Corp.*, 703 F.Supp.2d at 710 (E.D. Mich. 2010) (a complete cleaning of a ventilation system was not a direct physical loss), *aff'd*, 475 Fed.Appx. 569 (6th Cir. 2012).

The Centers for Disease Control and Prevention (CDC) instruct that the Coronavirus can be wiped off surfaces by cleaning: "The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes." (*See* CDC Reopening Guidance for Cleaning and Disinfecting (4/28/2020), attached as Exhibit C; *See also* CDC, *Cleaning and Disinfection for Households*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cleaning-disinfection.html (accessed July 7, 2020)).[7] Thus, even where the Coronavirus is or was actually present, there is no direct physical loss because the virus either dies naturally in a short time, or it can be wiped away.

### C.   The Lack of a Virus-Related Exclusion is Irrelevant Because There is No Direct Physical Loss

Plaintiff claims that coverage exists because the Policy does not contain an exclusion "for losses caused by a virus or by governmental orders issued in order to prevent exposure to a virus." (Compl. at ¶ 18). That assertion is legally incorrect. An exclusion can become relevant only if

---

[7] Again, this Court may take judicial notice of the CDC reports and other matters of public record without converting Cincinnati's motion to dismiss to a motion for summary judgment. *See, e.g., Hynoski*, 941 F. Supp. 2d at 555.

Plaintiff first meets its burden of showing that there is direct physical loss. As established, Plaintiff cannot do so.

Where an insured fails to meet its burden to show an initial grant of coverage, judgment in favor of the insurer is appropriate. *See, e.g., Fry v. Phoenix Ins. Co.*, 54 F. Supp. 3d 354, 361 (E.D. Pa. 2014) (applying Pennsylvania law) (Stengel, J.), *citing Estate of O'Connell ex rel. O'Connell v. Progressive Ins. Co.*, 2013 PA Super 271, 79 A.3d 1134, 1138 (2013). For instance, in *Fry*, the parties submitted competing evidence concerning whether the policy's wear and tear exclusion applied to preclude coverage for the collapse of an exterior stone veneer wall. *Fry*, 54 F. Supp. 3d at 363-365. But, because the insured's knowledge of existing defects in the wall precluded an initial grant of coverage under the policy's collapse coverage, the exclusion was irrelevant. *Fry*, 54 F. Supp. 3d at 363-365. Likewise, in *Estate of O'Connell*, it was irrelevant whether the trial court misconstrued policy exclusions, because the vehicle involved in the accident did not qualify as an underinsured motor vehicle in the first instance. *Estate of O'Connell,* 79 A.3d at 1138-1141.

Courts throughout the Country agree: where there is no direct physical loss, there is no coverage. Given this fact, policy exclusions are irrelevant here. *See*, *e.g.*, *Ward Gen. Ins. Servs., Inc. v. Employers Fire Ins. Co*., 114 Cal. App. 4th 548, 555, 7 Cal. Rptr. 3d 844, 850 (2003) (database crash did not constitute direct physical loss; therefore, it was "unnecessary to analyze the various exclusions and their application to this case"); *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.,* 17 F. Supp. 3d 323, 333 (S.D.N.Y. 2014) (power outage that caused law firm to close was not direct physical loss; thus, it was unnecessary to decide whether a flood exclusion applied), citing *Roundabout Theatre Co. v. Cont'l Cas. Co*., 302 A.D.2d 1, 9, 751 N.Y.S.2d 4, 10 (2002).

18

As established, Plaintiff cannot show the threshold requirement of a Covered Cause of Loss. Covered Cause of Loss means all risks *of direct physical loss* that are neither excluded nor limited. Thus, if there is no direct physical loss in the first place, the existence or absence of an exclusion "for losses caused by governmental orders issued in order to prevent exposure to a virus" is irrelevant. (Compl. at ¶ 18).

In sum, there is no coverage here because there is no direct physical loss. For that reason, no exclusion is needed.

## III.    There Is No Civil Authority Coverage

As established, the Policy's Civil Authority coverage only applies if there is a Covered Cause of Loss, meaning direct physical loss that is not excluded or limited, to property other than the Plaintiff's property. Even then, there is only Civil Authority coverage if, among other things, the action of the civil authority prohibits access to the insured premises. (Policy, pp. pp. 53 & 106). "[L]osses due to curfew and other such restrictions are not generally recoverable. * * * If a policy provides for business interruption coverage where access to an insured's property is denied by order of civil authority, access to the property must actually be specifically prohibited by civil order, not just made more difficult or less desirable." 11A *Couch on Ins.* § 167:15.

### A.    There is No Direct Physical Loss to Other Property

Cincinnati has demonstrated that direct physical loss to property other than the Plaintiff's property is necessary. Courts nationwide have upheld that requirement. *See, e.g., Philadelphia Parking Auth.*, 385 F. Supp. 2d at 289 (applying Pennsylvania law); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.,* 2020 WL 886120, 8 (D.S.C. Feb. 24, 2020); *Not Home Alone, Inc. v. Philadelphia Indem. Ins. Co.,* 2011 WL 13214381, 6 (E.D. Tex. Mar. 30, 2011); *S. Texas Med.*

*Clinics, P.A. v. CNA Fin. Corp.,* 2008 WL 450012, 10 (S.D. Tex. Feb. 15, 2008); *United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 131 (2d Cir. 2006).

Just as the Coronavirus is not causing direct physical loss to the Plaintiff's premises, it is not causing direct physical loss to other property. The Complaint fails to identify any distinct, demonstrable, physical alteration of property, anywhere. Rather, it alleges the Closure Orders have required Plaintiff to suspend "business for on-site services to prevent potential exposure to COVID-19." (Compl. at ¶ 3). No facts are alleged that demonstrate that these things happened because of direct physical loss to anybody's property. Instead, as the Plaintiff admits, closing or limiting of business operations protected the public from human to human transmission of the virus: "Pennsylvania Governor Wolf's order dated March 19, 2020 . . . was issued to protect the lives and health of millions of Pennsylvania citizens." (Compl. at ¶ 21; *and see* Compl. at ¶¶ 18-19).

There are no alleged facts asserting any direct physical loss. There are no alleged facts showing any change or alteration of anybody's physical property by the Coronavirus or the Closure Orders. There are, however, facts showing that the Coronavirus can be removed via cleaning. As established, this is the marker of something that is ***not*** direct physical loss. Accordingly, there is no direct physical loss to any other property as is required for Civil Authority coverage.

**B.    The Requisite Prohibition of Access Is Lacking**

The Civil Authority coverage also requires that access to Plaintiff's premises be prohibited by an order of civil authority. But, the Plaintiff does not allege the Closure Orders prohibited access to its premises. Nor could it. Under Pennsylvania's Closure Order non-essential businesses, including Plaintiff's business, remained open and accessible to owners, employees and others so

that they could perform "minimum basic operations."[8] Furthermore, the Closure Orders expressly permitted restaurants and bars, like Plaintiff's, to "***offer carry-out, delivery, and drive-through food and beverage service*** . . . ***so long as social distancing and other mitigation measures are employed to protect workers and patrons.***"[9] (Emphasis in original). Because there was no prohibition of access, there is no Civil Authority coverage.

The prohibition of access requirement is pervasive nationally. As discussed, the insured parking garage owner in *Philadelphia Parking* failed to show the FAA's order grounding flights after 9/11 prohibited access to its premises, as required for civil authority coverage under Pennsylvania law. Likewise, in *Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 WL 2696782, 4 (M.D. Pa. July 6, 2010), a bridge repair hindered or dissuaded the majority of customers from visiting a ski resort., but did not constitute prohibition of access to the premises.

To the same effect is *Southern Hospitality, Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137 (10th Cir. 2004) (applying Oklahoma law) (access to hotels was not prohibited by FAA order grounding flights in response to 9/11 attacks). *See also*, *e.g.*, *Syufy Enterprises v. Home Ins. Co. of Indiana*, 1995 WL 129229, 2 (N.D. Cal. Mar. 21, 1995) (riot-related curfew prevented insured's customers from being out and about, it did not prohibit access to the insured's premises); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.,* 268 A.2d 611, 614 (D.C. 1970) (same); *Schultz Furriers, Inc. v Travelers Cas. Ins. Co. of America*, 2015 WL 13547667, 6 (N.J. Super. L. July 24, 2015) (despite serious traffic issues in lower Manhattan following Superstorm Sandy, it was not completely impossible for the public to access the insured store). *See also, Goldstein v Trumbull Ins. Co.*, 2016 WL 1324197, 12

---

[8] https://www.governor.pa.gov/wp-content/uploads/2020/04/Life-Sustaining-Business-Frequently-Asked-Questions-4.20.20-2.pdf (see pg. 4 at ¶ 14).
[9] *See, e.g.,* https://www.governor.pa.gov/wp-content/uploads/2020/03/20200319-TWW-COVID-19-business-closure-order.pdf (see Sect. 2 at p. 2)

(N.Y. Sup. Ct. Apr. 05, 2016); *TMC Stores, Inc. v. Federated Mut. Ins. Co.*, 2005 WL 1331700, 4 (Minn. Ct. App. June 7, 2005).

Because the Complaint's allegations establish access was not prohibited, the Civil Authority coverage does not apply.

**IV.   Conclusion**

For the reasons established above, the Motion to Dismiss of The Cincinnati Casualty Company should be granted.

Respectfully submitted,

**LITCHFIELD CAVO LLP**

BY:   /s/ Lawrence M. Silverman
Lawrence M. Silverman
 (Bar ID No. 17854)
1515 Market Street, Suite 1220
Philadelphia, PA  19102
Telephone:  215.557.0111
Facsimile:  215.557.3771
silverman@litchfieldcavo.com

July 9, 2020

22

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MILKBOY CENTER CITY LLC,<br>Individually and on behalf of all others<br>similarly situated<br><br>                            Plaintiff,<br>      vs.<br><br>THE CINCINNATI CASUALTY<br>COMPANY<br><br>                      Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:   CIVIL ACTION NO. 2:20-CV-02036-TJS |

## CERTIFICATE OF SERVICE

I, Lawrence M. Silverman, Esquire, do hereby certify that a true and correct copy of the Motion

of The Cincinnati Casualty Company to Dismiss Plaintiff's Complaint was filed and served by the

Court's electronic filing system, on this 9th day of July, 2020, upon the following:

Jeffrey A. Barrack, Esquire
Mark R. Rosen, Esquire
Meghan Jane Talbot, Esquire
Daniel E. Bacine, Esquire
BARRACK, RODOS & BACINE
2001 Market Street
3300 Two Commerce Square
Philadelphia, PA 19103-7087

**LITCHFIELD CAVO LLP**

**BY:**     */s/ Lawrence M. Silverman*
Lawrence M. Silverman, Esquire
Attorney I.D. No.: 17854
1515 Market Street, Suite 1220
Philadelphia, PA 19102
215-557-0111/Fax: 215-557-3771
silverman@litchfieldcavo.com

*Attorneys for Defendant,*
*The Cincinnati Casualty Company*